## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **Bruce Murray,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | No. 24-cv-_____ |
| | : | |
| **City of Philadelphia; Leon Lubiejewski;** | : | **Jury Trial Demanded** |
| **James McNesby; John Doe 1 as Personal** | : | |
| **Representative of the Estate of Lawrence** | : | |
| **Gerrard; Nicole Brongo Kiwa Ford as** | : | |
| **Executrix of the Estate of Ernest Gilbert;** | : | |
| **John Doe 2 as Personal Representative of** | : | |
| **the Estate of Albert Lory, Jr.; John Doe 3** | : | |
| **as Personal Representative of the Estate** | : | |
| **of Lawrence Grace; John Doe 4 as** | : | |
| **Personal Representative of the Estate of** | : | |
| **William Shelton; John Doe 5 as Personal** | : | |
| **Representative of the Estate of Douglas** | : | |
| **Culbreth; Detective Curcio; Detective** | : | |
| **Diegel; Lynn Sturkey; James Potocnak;** | : | |
| **and Daniel Rosenstein,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## <u>COMPLAINT</u>

### I.    Preliminary Statement

1.     Plaintiff Bruce Murray brings this action to address the extraordinary and unconstitutional misconduct of detectives in the Philadelphia Police Department's Homicide Division, whose actions caused Murray's wrongful arrest, prosecution, conviction, and incarceration for a murder he did not commit. As a result of defendants' serious misconduct, Murray spent more than 40 years wrongfully imprisoned.

2.      In the early evening of December 16, 1980, Eric "Kaboobie" DeLegal was shot and killed inside his home in South Philadelphia.

3.      Over the next 14 months, police developed evidence that DeLegal was killed in an attempted robbery that erupted into a shootout. They learned that two people were responsible for the robbery-turned-murder: Douglas Haughton and Tyrone Wesson.

4.      At the time of the investigation, detectives in the Philadelphia Police Department's homicide division believed that gangs of young Black men in South Philadelphia were responsible for escalating violent street crime. Feeding off that belief, they used the DeLegal murder investigation to target young, Black men in the community with fabricated prosecutions.

5.      Two of those young Black men wrongfully targeted by police were plaintiff Bruce Murray and Gregory Holden. The defendant detectives investigating the DeLegal murder knew that all reliable evidence suggested that Haughton and Wesson were the only two perpetrators. Yet, despite that knowledge, they expanded the prosecution to include Murray and Holden.

6.      Murray and Holden were in no way involved in the DeLegal shooting, were not at the scene of the murder, and had no direct knowledge of the crime.

7.      The defendant detectives, however, initiated a prosecution against them by using plainly unlawful coercive tactics. When they arrested Douglas Haughton, they told him he would face the death penalty unless he adopted a statement containing the police-crafted narrative of the murder. And when they arrested Tyrone Wesson, then a 17-year-old juvenile, they denied him access to an attorney and coerced him into signing a statement largely matching Haughton's.

8.      Police aided their fabricated prosecution of Murray and Holden by intentionally concealing and suppressing information that would have been highly exculpatory, including

2

reports and notes showing the role in the investigation of a known gang member and police informant who was present at the scene of the shooting.

9.     As a direct result of this misconduct, plaintiff Bruce Murray was convicted for DeLegal's murder and sentenced to life imprisonment without parole.

10.     Since the time of Murray's conviction, Haughton and Wesson consistently reported that they alone went to DeLegal's house together to purchase cannabis and confront DeLegal regarding an outstanding debt, that they engaged in an unplanned shootout resulting in DeLegal's death, and that Murray and Holden were not involved or present.

11.     Murray fought for more than forty years to prove his innocence, filing repeated, unsuccessful challenges to his conviction and presenting courts with more and more evidence that he was not involved in the shooting, including exculpatory affidavits and testimony from Haughton, Wesson, and other witnesses.

12.     It was not until 2022, when Murray was granted access to the Philadelphia Police Department's ("PPD") Homicide File documenting the investigation into DeLegal's death, that he discovered numerous pieces of suppressed evidence. Based on that suppressed evidence, Murray was able to demonstrate his innocence to the courts and the Philadelphia District Attorney's Office.

13.     On June 6, 2023, this Court granted Murray habeas corpus relief and vacated his conviction based on defendants' suppression of exculpatory evidence. On October 11, 2023, the Philadelphia Court of Common Pleas granted the prosecution's motion to dismiss all charges against Murray.

14.     Murray's conviction and four decades of imprisonment for a crime he did not commit were the direct result of the defendants' fabrication of evidence, malicious prosecution,

and intentional suppression of exculpatory information. As with numerous other cases involving innocent Philadelphians wrongfully convicted of murder, these grave violations of Murray's rights were caused by the City of Philadelphia's widespread practice of failing to train, supervise, and discipline detectives in the PPD Homicide Division to comply with clearly established constitutional obligations and the City's acquiescence to established customs of improper police practices.

15.     Murray brings this civil rights action under 42 U.S.C. § 1983 seeking accountability for the violation of his constitutional rights and substantial harms and losses he suffered.

## II.     Jurisdiction and Venue

16.     This Court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. § 1983 and 28 U.S.C. § 1331, 1343(a)(3), 1343(a)(4), and 1367(a).

17.     Venue is proper in this Court as the incidents at issue in this matter occurred within the Eastern District of Pennsylvania.

## III.     Parties

18.     Plaintiff Bruce Murray, age 63, was at all times relevant to this Complaint a resident of Philadelphia, Pennsylvania.

19.     Defendant City of Philadelphia is a municipality in the Commonwealth of Pennsylvania and owns, operates, manages, directs, and controls the Philadelphia Police Department, which, at all relevant times, employed the below individual detective defendants.

20.     Defendant Leon Lubiejewski, Badge No. 743, was at all times relevant to this Complaint a detective in the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity.

21.     Defendant James McNesby, Badge No. 721, was at all times relevant to this Complaint a detective in the Philadelphia Police Department's Homicide Division.  He is sued in his individual capacity.

22.     Defendant John Doe 1 is the personal representative of the Estate of Lawrence Gerrard, Badge No. 9189, who was at all times relevant to this Complaint a detective in the Philadelphia Police Department's Homicide Division. Doe 1 is sued in his capacity as the personal representative of Gerrard's estate.

23.     Defendant Nicole Brongo Kiwa Ford is the Executrix of the Estate of Ernest Gilbert, Badge No. 9148, who was at all times relevant to this Complaint a detective in the Philadelphia Police Department's Homicide Division. Brongo Kiwa Ford is sued in her capacity as the Executrix of Gilbert's estate.

24.     Defendant John Doe 2 is the personal representative of the Estate of Albert Lory, Jr. Badge No. 9186, who was at all times relevant to this Complaint a detective in the Philadelphia Police Department's Homicide Division. Doe 2 is sued in his individual capacity as personal representative of Lory's estate.

25.     Defendant John Doe 3 is the personal representative of the Estate of Lawrence Grace, Badge No. 887, who was at all times relevant to this Complaint a detective in the Philadelphia Police Department's Homicide Division. Doe 3 is sued in his individual capacity as personal representative of Grace's estate.

26.     Defendant John Doe 4 is the personal representative of the Estate of William J. Shelton, Badge No. 257, who was at all times relevant to this Complaint a detective in the Philadelphia Police Department's Homicide Division. Doe 4 is sued in his individual capacity as personal representative of Shelton's estate.

27.     Defendant John Doe 5 is the personal representative of the Estate of Douglas Culbreth, Badge No. 9028, who was at all times relevant to this Complaint a detective in the Philadelphia Police Department's Homicide Division. Doe 5 is sued in his individual capacity as personal representative of Culbreth's estate.

28.     Defendant Curcio was at all times relevant to this Complaint a detective in the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity.

29.     Defendant Diegel, Badge No. 602, was at all times relevant to this Complaint a detective in the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity.

30.     Defendant Lynn Sturkey, Badge No. 256, was at all times relevant to this Complaint a lieutenant in the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity.

31.     Defendant James Potocnak, Badge No. 164, was at all times relevant to this Complaint a lieutenant in the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity.

32.     Defendant Daniel Rosenstein, Badge No. 370, was at all times relevant to this Complaint a sergeant in the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity.

33.     At all times relevant to this Complaint, the defendants acted in concert and conspiracy and were jointly and severally responsible for the harms caused to plaintiff.

34.     At all times relevant to this Complaint, all defendants acted under color of state law.

IV.    **Facts**

A. **Eric "Kaboobie" DeLegal is murdered and police disregard early tips as to the true circumstances of his death.**

35.     On December 16, 1980, at approximately 5:47 p.m., Philadelphia police officers responded to reports of a shooting at a house on Montrose Street in the Graduate Hospital neighborhood.

36.     Upon their arrival, police discovered Eric "Kaboobie" DeLegal lying on his side in a large pool of blood. Police recovered a bolt from a 20-gauge shotgun, a 20-gauge spent shotgun shell, and wadding from a shotgun shell, all located within three feet of DeLegal's body.

37.     DeLegal was known as a neighborhood cannabis dealer, and police located a small manila envelope of cannabis from one of his pockets, as well as approximately 3.5 pounds of cannabis from an upstairs bedroom of the house.

38.     DeLegal was taken to Graduate Hospital, where he was pronounced dead at approximately 6:40 p.m.

39.     The Philadelphia Police Department Homicide Division assigned responsibility for the investigation of DeLegal's murder to Detective Albert Lory, Jr., who was aided in the investigation by Detectives Gerrard, Gilbert, Lubiejewski, Grace, McNesby, Shelton, Culbreth, Curcio, Diegel, and Lieutenant Potocnak. The investigation was supervised by Lieutenant Sturkey and Sergeant Rosenstein. These detectives and supervisors, and, where relevant, their estates, are referred to below collectively as the "individual defendants" or "defendant detectives."

40.     To the extent any individual defendant did not directly participate in a specific portion of the investigation, all defendants learned of the below-described investigative conduct based on their regular communications with the other individual defendants through the course

of the investigation. As such, all defendants knew of or recklessly disregarded each other

defendant's unlawful actions and inactions throughout the prosecution of plaintiff Bruce Murray,

yet they failed to act to prevent those actions and/or inactions from causing harm to Murray.

41.     The evening of DeLegal's murder, Detective Lory and Officer James Feldmeyer

interviewed a man named George Young, who told them he was walking westward on Montrose

Street when he heard a single, very loud shot. Young saw two Black males flee DeLegal's house.

He then went inside the residence where he observed DeLegal injured, lying in a pool of blood.

Young called 911 and stayed at the scene until after first responders arrived.

42.     Shortly after speaking with Young, Detective Lory learned that a local drug dealer

named Elliott Burton had informed the District Attorney's Office ("DAO") that a sixteen-year-

old male named Gregory "Dap" Strickland was present inside DeLegal's residence at the time of

the shooting.

43.     Burton was known to defendant detectives as a leader of a local gang called the

20th and Carpenter Street gang. He was also working for police as a confidential informant,

providing police with information regarding other gang members, as well as young men who

lived in the neighborhood.

44.     The next piece of evidence homicide detectives received was a telephone call

from a man named John Howard, who told them that, after the shooting, he saw Burton flee from

DeLegal's residence while carrying a shotgun. Howard reported that Burton got into either a

1977 or 1978 Buick and drove away.

45.     On January 5, 1981, the defendant detectives recorded information about

Howard's tip on an activity sheet, a PPD Homicide Division form used to log details learned

during an investigation.

46.     The defendant detectives made minimal effort to locate Howard and did not speak to him again.

47.     The detectives ignored these early leads pointing to Burton's involvement in the crime. Despite having contact with Burton, they neither investigated Burton's involvement, nor did they ever conduct a formal interview with Burton regarding DeLegal's murder.

48.     On January 6, 1981, Detectives Lory and Deyne interviewed Gregory Strickland, who admitted to being present in DeLegal's basement at the time of the murder.

49.     Strickland told detectives that on the day of DeLegal's death he heard the doorbell ring and saw DeLegal go upstairs to answer the front door, after which he heard people in the living room and then a big boom followed by several smaller sounding shots. He heard DeLegal yell out in pain and heard someone run up the stairs to the second floor and then back down the stairs to the first floor. Strickland said he waited in the basement until he heard people leave the house, at which point he went upstairs and saw DeLegal on the floor bleeding. Strickland denied seeing any of the people who had entered the house at the time of the shooting.

50.     Strickland also told detectives that he was afraid and concerned for his safety because, since the shooting, he had been followed by a suspicious man and had been informed that men were waiting for him outside of his school.

**B.  The defendant detectives use facially unreliable sources to focus on Gregory Holden.**

51.     As of the end of January 1981, police had made no arrests for the DeLegal murder.

52.     In a document prepared later in the investigation, Lieutenant Potocnak claimed that sometime during the week of February 2, 1981, he learned from federal law enforcement agents that a confidential informant had reported that a man named Gregory Holden had

9

information regarding DeLegal's murder. Holden lived in the same neighborhood in which DeLegal was killed and police perceived him to be a member of the 20th and Carpenter Street gang. The informant reportedly claimed that Holden stated he was in possession of the bolt-action sawed-off shotgun used to shoot DeLegal.

53.     This information was false. Holden never possessed the shotgun used to kill DeLegal and never told anyone that he did.

54.     Lieutenant Potocnak claimed, further, that, according to the informant, Holden stated that the homicide was committed by "Bruce" (who Potocnak reported, without explanation, was assumed to be Bruce Murray, who also lived in the neighborhood), Douglas Haughton (aka Horton),  and "another male" during the course of an attempted robbery. According to Potocnak's account of the informant's report, Holden went on to say that during the robbery, DeLegal pulled out a .32-caliber revolver with tape on the butt and fired the weapon, striking "Bruce" in the upper arm.

55.     This information was, likewise, false as Holden never had such knowledge about the DeLegal shooting and did not tell anyone that he did. Further, it was not true that someone named "Bruce" was involved in DeLegal's death.

56.     Lieutenant Potocnak also reported receiving information, without specifying the source, that on or around December 17, 1980, "a male i.d. as Bruce Murray" reported he had been shot in the right arm. At the time, it was easily verifiable that this information was false and that Bruce Murray was not shot on or around December 17, 1980. Defendant detectives, however, either did nothing to verify this information or disregarded evidence proving the falsity of this information. Defendant detectives later received affirmative confirmation that the information was false and that the reference to Bruce Murray was made by one of the actual

perpetrators of the DeLegal shooting who falsely provided a hospital with Murray's information in lieu of his own in order to avoid detection for his own involvement in the shooting.

57.     On February 25, 1981, Lieutenant Potocnak applied for and obtained a search warrant for Gregory Holden's residence based on the information he claimed to have obtained from the confidential informant who allegedly spoke to Holden about the DeLegal murder, as well as a second confidential informant who Potocnak claimed had told him that Holden's house was used as a local gang repository for guns.

58.     The assertions in the affidavit in support of the search warrant were false as Holden never provided any informants with information regarding the DeLegal murder and his house was not used as a repository for guns.

59.     Police executed the warrant at Holden's residence and did not locate any firearms.

60.     Having no grounds to arrest Holden, the defendant detectives then used their informant Elliott Burton, previously identified by a witness as having been present at the scene in possession of a shotgun, to record a telephone conversation with Holden. In the call, Burton asked leading questions about the shootout at DeLegal's house, attempting to goad Holden into inculpating himself.

61.     Holden did not know that Burton was working as an informant, nor did he know the call was being recorded. Consistent with his innocence, Holden credibly and adamantly denied any involvement in the murder.

62.     On March 11, 1981, defendant detectives brought a man named Edward Randolph (aka Randall) to police headquarters to question him about several different cases. Defendant detectives believed Randolph to be a suspect in the shooting death of Lamar Reddick, and they believed Randolph was aware he was a suspect. Defendant detectives therefore believed they

could coerce Randolph into providing statements regarding other unsolved crimes. This proved to be correct and, as a result of defendant detectives' coercion, Randolph went on to give four statements in the same day.

63.    Initially, around 11am, Detectives McNesby and Culbreth interviewed Randolph regarding the Reddick shooting. Randolph admitted to arguing with Reddick on the day he was killed.

64.    In an effort to avoid charges in the Reddick murder, Randolph told detectives about a man named Larry Thorpe, a local gang member whom the defendant detectives had investigated extensively. Detectives McNesby and Culbreth wanted further grounds to arrest Thorpe, so they improperly suggested that Randolph should attribute additional shootings to him. As a result of that suggestion Randolph told them that Thorpe "was supposed to be the mastermind" of the DeLegal shooting.

65.    Because nearly three months had passed since the DeLegal shooting and defendant detectives had yet to obtain evidence that would lead to charges against any perpetrator, the reference to Thorpe's involvement in that shooting was highly significant.

66.    For that reason, immediately after the interview with Randolph focused on the Reddick murder, Detective McNesby conducted a separate interview with Randolph to address the DeLegal case in more detail.

67.    In truth, Randolph knew nothing about the DeLegal murder. However, because Randolph was vulnerable to prosecution himself and highly motivated to ingratiate himself to the police, defendant detectives knew they could compel Randolph to adopt a fabricated statement about the DeLegal murder.

68.     McNesby crafted a statement for Randolph by using information and rumors about the DeLegal shooting that the defendant detectives had previously obtained from Burton or other confidential informants as well as completely fabricated information they knew would allow them to arrest young men they believed to be members of the 20th and Carpenter Street gang, including Thorpe and Holden.

69.     Attributing information about the DeLegal murder to Randolph was critical to preserving the defendant detectives' relationship with their informant, Burton. It would allow them to maintain the confidentiality of his role, and, further, eliminate him as a suspect.

70.     According to the statement McNesby prepared, Randolph said that the day after the shooting, Holden had given him a full account of the murder: that Bruce Murray and someone known to Randolph only as "Scotty" went to DeLegal's house, DeLegal let Murray in to sell him cannabis, Scotty ran into the house with a shotgun and told DeLegal it was a robbery, and then the attempted robbery turned into an accidental shootout. Holden explained, further, according to Randolph's alleged account, that he and Thorpe were waiting across the street from the house for Murray and Scotty to let them in to join the robbery, but when they heard shooting, they left the scene.

71.     This statement was knowingly fabricated by the defendant detectives. Holden never provided Randolph an account of DeLegal's murder, and Holden, Murray, and Thorpe were all completely uninvolved in DeLegal's death.

72.     The statement also included Randolph's account of information attributed to Gregory Strickland, the 16-year-old who was in DeLegal's basement at the time of the shooting and told police that he did not see anyone who entered the house. According to Randolph's account, Strickland told him that he had in fact seen one of the perpetrators: Douglas Haughton.

13

The defendant detectives documented in an activity sheet their incorrect assumption that the "Scotty" mentioned by Randolph was Haughton.

73.     After Detective McNesby completed the interview with Randolph, Sergeant Rosenstein directed Detectives Curcio and Diegel to conduct yet another interview with Randolph about the DeLegal murder. In this interview, Randolph identified photos of Murray, Haughton, Thorpe, and Holden. Additionally, Curcio and Diegel fabricated details attributed to Randolph in an effort to bolster the previous statement prepared by Detective McNesby.

74.     That evening, Randolph went on to provide detectives a fourth statement, this one addressing an alleged gang member and drug dealer with no apparent connection to the DeLegal murder.

75.     Defendant detectives knew their fabricated statements regarding the DeLegal murder, which they coerced Randolph to adopt, were false, that Holden had never spoken to Randolph about the shooting, and that police had no reliable evidence to suggest that Murray, Holden, or Thorpe were involved in the crime.

76.     On March 13, 1981, Detective Lory conducted a second interview with Strickland to address the inconsistency between Strickland's statement to police that he did not see anyone who entered DeLegal's house and Randolph's statement attributing to Strickland an identification of Haughton. In that interview, Strickland flatly denied telling Randolph he had seen Haughton at DeLegal's house, maintained that he had not seen anything, and reported that the rumor in the neighborhood was that "Bruce and Scot" committed the murder.

77.     Strickland's statement that he did not know who shot DeLegal and his claim regarding the rumor referencing "Bruce" were transparently false and the result of Strickland's fear of reprisal from those involved in the murder. Detective Lory knew Strickland's statement

was false, which he confirmed by administering a polygraph examination that Strickland failed. Defendant detectives suppressed the polygraph results showing "DI," or deception indicated, because they did not want Strickland questioned further as to the identities of the true perpetrators, knowing his account would not match their fabricated narrative implicating Murray and Holden.

78.     Armed with Randolph's fabricated statement, defendant detectives had what they needed to arrest Holden, as they initially intended. Detective Lory prepared an affidavit of probable cause based solely upon Randolph's statements and the falsehoods contained therein.

79.     After a warrant issued, the defendant detectives arrested Holden for the DeLegal murder on March 20, 1981.

80.     Following the arrest, however, Randolph did not appear to testify at a preliminary hearing. As a result, the charges against Holden were dismissed on May 13, 1981.

81.     The defendant detectives, knowing that Holden's arrest was based on false information attributed to Randolph and fearing that Randolph would not go along with their plan to provide fabricated testimony if forced to take the stand, made no effort to locate Randolph to compel him to testify against Holden.

82.     The defendant detectives' attempts to fabricate a prosecution for the DeLegal murder based on Randolph's false statements failed, and the case remained in an unsolved status.

**C.  Douglas Haughton is arrested and detectives coerce him into fabricating a statement implicating Mr. Murray in the DeLegal murder.**

83.     Following the dismissal of charges against Holden, there was no progress in the investigation of DeLegal's death for nine months.

84.     The investigation was reopened on February 24, 1982, when Douglas Haughton was arrested on federal bank robbery charges in Philadelphia.

85.     After Haughton's arrest, Detective Gerrard, joined by others of the defendant detectives, interrogated Haughton for hours about DeLegal's death while an FBI agent threatened him with physical violence.

86.     The detectives told Haughton they knew he was involved in DeLegal's death, that they had photographs and information proving his involvement in the bank robbery, and that he would receive a life sentence or even the death penalty.

87.     The officers told Haughton that if he agreed with their version of events, he would receive a much lighter sentence.

88.     The version the defendants wanted Haughton to adopt was based largely on the false statements previously obtained from Edward Randolph in March 1981.

89.     Detective Gerrard emphasized to Haughton that, in order to receive a lighter sentence, his account of DeLegal's murder would have to match Randolph's statements—regarding, in particular, the involvement of Murray and Holden—with one key exception.

90.     By the time of Haughton's arrest, Detective Gerrard had learned that Thorpe, whom Randolph's statement had characterized as the mastermind of the attempted-robbery-turned-shooting and whom Randolph purportedly claimed was present at the scene, had been in custody on unrelated felony charges on the day of the shooting. As a result, when Detective Gerrard interrogated Haughton, he told Haughton he would have to provide an account that did not implicate Thorpe.

91.     The defendant detectives did not take a formal statement from Haughton on February 24, 1982. They waited until they were certain Haughton would sign a statement describing the version of the DeLegal murder they wanted him to adopt.

92.     At the outset, Haughton resisted adopting the defendant detectives' narrative. He told them that Murray and Holden had nothing to do with the crime.

93.     On March 4, 1982, Detectives Gerrard and Gilbert formally interviewed Haughton and coerced him to sign a written statement adopting the detectives' preferred narrative, that Murray and Holden were involved in DeLegal's death. As a result of the defendant detectives' threats and his concerns that he would face the death penalty, Haughton signed the statement.

94.     Detectives Gerrard and Gilbert fabricated large swaths of the statement attributed to Haughton, in particular the involvement of Murray and Holden.

95.     The defendant detectives had no reasonable basis to believe that Murray and Holden played any part in the DeLegal murder.

96.     Haughton's statement also included the true fact that Scotty, not Murray, was shot in the shootout with DeLegal and that, in the days after the shooting, his left arm was bandaged from a gunshot wound.

97.     This information from Haughton, who was present for the entirety of the incident, that it was Scotty, not Murray, who had been shot contradicted the earlier information detectives had received regarding "Bruce" being shot which defendant detectives had made no effort to verify.

98.     Defendant detectives either intentionally disregarded this evidence exculpating Murray, choosing not to investigate it, or they confirmed that the reports of Murray being shot were untrue and purposefully failed to document it, proceeding in their efforts to fabricate a prosecution against him.

99.     Based on Haughton's signed statement, on March 23, 1982, Detective Lubiejewski prepared an affidavit of probable cause seeking Haughton's arrest for the DeLegal murder, and on April 1, 1982, Detectives Gerrard and Gilbert arrested him.

100.     On the day of his arrest for the DeLegal murder, Haughton gave Gerrard and Gilbert a second statement clarifying that the person he described as "Scottie," who was inside DeLegal's residence at the time of the shootout, was a man named Tyrone Wesson.

101.     On April 21, 1982, Haughton plead guilty to the federal bank robbery charge.

102.     On September 8, 1982, Haughton plead guilty to third-degree murder in connection with the DeLegal shooting. Haughton's plea agreement was entirely contingent upon him testifying for the prosecution against his alleged coconspirators, including Murray. In exchange for his testimony, the agreement provided that Haughton would receive, at most, a sentence of 10–20 years imprisonment, to run concurrently with the sentence he would receive for his federal bank robbery conviction. The agreement also provided that he would serve his sentence at a low-security federal prison in Colorado.

**D. The defendant detectives arrest Mr. Murray based on Haughton's fabricated statement.**

103.     The day after Haughton plead guilty, on September 9, 1982, Detective Lubiejewski obtained a warrant for Murray's arrest, based solely on Haughton's fabricated statement.

104.     Defendant detectives were aware that the affidavit's description of the shooting was inaccurate in its references to Murray and Holden.

105.     The affidavit of probable cause to arrest Murray did not include the following information, which was suppressed and exculpatory to Murray:

> a.   The tip describing Burton running from the scene of the crime holding a

shotgun, which showed Burton's potential involvement in the murder, and was inconsistent with the narrative provided by Haughton and the defendant detectives;

b.  The police-recorded call between Burton and Holden, demonstrating Burton's role as an informant, in which Holden denied involvement in the shooting and stated that he heard "Bruce" had been shot in the arm during the shooting, a fact that Murray could prove to be false;

c.  The affidavit of probable cause supporting the search warrant for Holden's home prepared by Lieutenant Potocnak, demonstrating that Potocnak relied on a confidential informant who provided inaccurate information that Murray was shot in the arm, a fact that Murray could prove to be false;

d.  Police notes documenting information from Randolph that Strickland told him directly that he had seen Haughton, not Murray, in DeLegal's house after the shooting, a fact that undermined Haughton's signed statement asserting that Murray was one of the shooters; and

e.  Strickland's polygraph results indicating that he had lied to detectives when he denied knowing who killed DeLegal, which was critical evidence of Strickland's effort to protect Haughton based on Strickland's fear of Haughton.

106.   Knowing that they had no probable cause to do so, detectives McNesby and Grace arrested Murray on September 11, 1982, in front of Murray's girlfriend, their infant child, and his girlfriend's family.

107.   At the time of Murray's arrest, Detective Gerrard and other defendant detectives

attempted to plant drugs on his person in their efforts to falsely paint Murray as being involved with drug selling and gangs. In a criminal complaint that Detective Gerrard prepared charging Murray with drug possession, Gerrard stated that thirty-four pills were found on Murray's person during a search incident to Murray's arrest. Murray was not in possession of any drugs at the time of his arrest, and he was later acquitted of the charged drug offenses. All the drugs Murray was accused of possessing had been planted by Detective Gerrard and other officers.

**E. Defendant detectives continue to falsify evidence to support their fabricated case against Murray.**

108.    The same day as Murray's arrest, Detective Lubiejewski obtained a warrant for the arrest of 17-year-old Tyrone "Scotty" Wesson, which, likewise, relied on Haughton's statement.

109.    Wesson is Murray's first cousin.

110.    At the time, Wesson's father and Murray's uncle, Lamont Wesson, was a Philadelphia police officer. After Tyrone Wesson was taken into custody, Lieutenant Shelton and/or other defendant detectives called Lamont Wesson to inform him that his son had been arrested and that his nephew, Murray, was also involved. The defendant detectives told Lamont Wesson that they had extensive evidence against his son Tyrone Wesson, including Haughton's statement. Lamont Wesson was given the opportunity to talk to his son, at which point he told Tyrone Wesson that he should not speak to the detectives.

111.    The defendant detectives, knowing that their case against Murray and Holden was weak and that Haughton's credibility would be easily questioned, set out to coerce Wesson into signing a fabricated statement inculpating Murray and Holden.

112.    At around 12:00pm, Detectives McNesby, Lubiejewski, and Gerrard, along with Lieutenant Shelton, interrogated Tyrone Wesson without an attorney or parent present. The

defendant detectives first asked Wesson questions about the Lamar Reddick murder. When the detectives began to question Wesson about the DeLegal murder, Wesson asked to speak to his father again.

113.    Wesson spoke with his father on the phone in the presence of Lieutenant Shelton around 1:00pm., at which point Lamont Wesson advised his son to ask for a lawyer. Wesson followed his father's advice and asked to have an attorney present. The defendant detectives told him he could not have an attorney because it was a Saturday and attorneys were unavailable on Saturdays and Sundays.

114.    The defendant detectives then gave Wesson a pre-typed statement regarding the DeLegal murder and told him that they knew he had participated in the shooting, that others would testify against him, that they would give him a deal if he cooperated, and that he would not be able to leave or speak to an attorney until after he signed their prewritten statement.

115.    All defendant detectives knew that this statement was false and that Wesson did not make it.

116.    The prewritten statement Wesson signed largely conformed to the statement that defendant detectives coerced Haughton into adopting, with the exception that it re-inserted Thorpe back into the narrative regarding DeLegal's death.

117.    The defendant detectives who wrote the statement attributed to Wesson did not know that Thorpe was incarcerated at the time of the shooting and could not have participated. As a result, Wesson's statement matched the statement attributed to Randolph and included a reference to Thorpe's involvement.

118.    At around 3:00pm, Detective Gerrard was alone with Wesson in the interrogation room when he noticed a round scar on Wesson's left forearm. Gerrard asked Wesson how he got

the scar and Wesson admitted he suffered a gunshot wound at DeLegal's house during the shootout.

119.    Wesson also told Gerrard that he went to the Hospital of the University of Pennsylvania after the shooting and used his cousin's name "Bruce Murray" to seek treatment for the gunshot wound.

120.    Although this new and crucial piece of information explained why detectives had heard "Bruce Murray" had been shot around the same time of the DeLegal murder and now knew the origin of the neighborhood rumor that a "Bruce" had been involved in the shooting, they proceeded to move forward with the fabricated evidence against Murray.

121.    Prior to trial, Wesson moved to suppress the statement attributed to him, describing how police had given him a prewritten, inaccurate statement to adopt and coerced him into signing it. Wesson's motion to suppress was denied.

122.    On November 4, 1982, Haughton testified as the sole Commonwealth witness at Murray and Wesson's joint preliminary hearing.

123.    The defendant detectives knew Haughton's preliminary hearing testimony was false, but because they had suppressed the exculpatory evidence described above, Murray was not in a position to challenge his testimony.

124.    On January 6, 1983, Holden was rearrested and recharged with DeLegal's murder and on January 19, 1983, Haughton testified as the sole Commonwealth witness at Holden's preliminary hearing.

125.    Haughton's testimony at the two preliminary hearings was internally inconsistent and inconsistent with his police statements, including as to essential facts such as who of the alleged coconspirators possessed firearms the day of the murder, where the firearms came from,

who made the plan to rob DeLegal, what Haughton witnessed from his position as "lookout," and what he did after the shooting.

126.    The defendant detectives knew Haughton's testimony was false in light of information they obtained early in the investigation that they had suppressed and continued to suppress throughout the prosecution.

127.    On January 20, 1983, the court ordered a police lineup for Murray, noting that George Young would be the identification witness to appear at the lineup. Knowing that Young would not identify the innocent Murray as one of the men he saw run from DeLegal's house after the murder, the defendant detectives instead brought Gregory Strickland to the lineup as the identifying witness and attempted to coerce Strickland into selecting Murray.

128.    Before the lineup, Detective Gerrard showed Strickland pictures of Murray and directed Strickland to say that Murray was one of the perpetrators.

129.    Strickland refused to cooperate with Detective Gerrard and falsely identify Murray as one of the shooters because Strickland knew that Murray was not the person he had seen in DeLegal's house at the time of the murder.

130.    The defendant detectives cancelled the lineup because Strickland would not agree to pick out Murray.

131.    Unable to proceed with a lineup that would support their narrative of the shooting, the defendant detectives prepared false reports asserting that the lineup was canceled because incarcerated people in the Philadelphia Department of Prisons refused to participate in the lineup due to the PPD's refusal to pay them an additional $0.05 to accommodate a recent increase in the price of commissary cigarettes.

132.    Despite a court order mandating the lineup, it was never rescheduled.

133.    The defendant detectives withheld evidence that Strickland refused their

suggestions to pick out Murray and they withheld an activity sheet documenting the fabricated

and easily disputable explanation for why the lineup was cancelled.

**F. Defendants' misconduct causes Mr. Murray to be convicted and sentenced to life in prison for the DeLegal's murder.**

134.   In June 1983, Murray was tried in a joint trial with co-defendants Tyrone Wesson

and Gregory Holden. Haughton was the only witness whose testimony directly implicated them

in DeLegal's murder.

135.   Haughton's trial testimony, which the defendant detectives knew to be false,

contained numerous inconsistencies with his written police statements and prior testimony at two

preliminary hearings. He remained consistent, however, as to the role that each person played in

the robbery: that Murray and Wesson went inside the house and shot DeLegal while he and

Holden remained outside as lookouts.

136.   Murray was unable to challenge the credibility of Haughton's testimony and the

prosecution's narrative because he did not have access to the exculpatory evidence withheld by

defendant detectives, including:

   a.   Evidence that Strickland told Randolph directly that he had seen Haughton,
        not Murray, inside DeLegal's house after the shooting;

   b.   Strickland's polygraph examination results indicating that he lied when he
        said he did not know who killed DeLegal;

   c.   Evidence demonstrating Burton's involvement in the shooting and role as an
        informant;

   d.   The recorded phone call and affidavit of probable cause in support of a
        warrant to search Holden's house, both containing information that Murray

was originally inculpated in the shooting based on the demonstrably false

rumor that he had been shot in the arm during the shootout with DeLegal; and

e.   Documentation that Strickland was brought to a lineup to identify Murray,

which was cancelled.

137.   In addition to Haughton's testimony, Detective Lubiejewski read to the jury a

minimally redacted version of the statement that defendants had fabricated and attributed to

Wesson.

138.   Murray presented three alibi witnesses and testified in his own defense, asserting

his innocence.

139.   On June 24, 1983, due to Haughton's false and coerced testimony and Wesson's

fabricated statement, Murray was convicted of second-degree murder, robbery, conspiracy to

commit robbery, and possession of an instrument of a crime.

140.   Four days after Murray's trial, Haughton was sentenced to 5–10 years

imprisonment for his role in the DeLegal murder to run concurrently with his federal bank

robbery sentence, which the trial judge emphasized amounted to "no sentence at all." Haughton

ultimately served only a total of seven years for both offenses.

141.   On April 24, 1984, Murray was sentenced to life imprisonment without the

possibility of parole.

**G.  Haughton and Wesson recant their statements inculpating Murray and Holden, confirm their culpability as the sole perpetrators, and detail defendant detectives' misconduct.**

142.   Wesson attempted to exonerate Murray as soon as the trial was concluded.

Moments before Murray was sentenced, Wesson told the court that he wanted to testify at trial

and if he had, he would have exonerated Murray and Holden, stating "I would have cleared the other two defendants."

143.    On April 11, 1985, while he was still incarcerated and awaiting parole, Haughton signed two affidavits documenting Murray's innocence and the police misconduct that caused Haughton to sign a false statement implicating Murray and Holden.

144.    In these affidavits, Haughton provided a true account of the crime. He explained that on the day of the shooting he and Wesson went to DeLegal's house by themselves, intending to buy cannabis. DeLegal, however, was armed and under the influence of drugs when they arrived at his home, and a scuffle turned into an accidental shooting. Haughton's statement confirmed that he and Wesson both shot DeLegal and that Wesson was shot in the arm.

145.    Haughton also described how Detective Gerrard and other defendant detectives insisted that he inculpate Murray and Holden in the murder, even though they were not involved in any way.

146.    Haughton acknowledged that he only signed a statement implicating Murray and Holden because the police coerced him into doing so, threatening him with extreme sentences—including the death penalty—and physical violence.

**H.  Mr. Murray spends more than forty years challenging his conviction and obtains relief after receiving the PPD's Homicide File and discovering withheld evidence.**

147.    Murray challenged his conviction through a direct appeal and numerous post-conviction filings in both state and federal courts.

148.    During a post-conviction evidentiary hearing in 1991, Haughton testified consistently with his 1985 recantation affidavits.

149.    Wesson also testified at the 1991 evidentiary hearing and corroborated Haughton's accounts of the DeLegal murder and police coercion to falsely implicate Murray and Holden.

150.    Despite this testimony, Murray was denied relief and he remained incarcerated in the Pennsylvania Department of Corrections for decades.

151.    Finally, on December 2, 2020, after considering Murray's third attempt to reopen his previously denied federal habeas petition in this Court, the Honorable Anita B. Brody appointed counsel to represent Murray on his actual-innocence claim.

152.    The Philadelphia District Attorney's Office gave Murray's appointed counsel access to the PPD's previously undisclosed Homicide File, documenting the investigation into DeLegal's murder.

153.    The Homicide File contained numerous pieces of withheld evidence supporting Murray's innocence and Haughton and Wesson's claims of police coercion and misconduct including:

    a.    Police documentation, including an activity sheet and handwritten notes, showing that the sole eyewitness present in DeLegal's house, Strickland, had told Randolph that immediately after the shooting he saw Haughton inside the house, not Murray;

    b.    An interrogation form with handwritten notes documenting the results of Strickland's polygraph examination, demonstrating that police knew he had lied when he said he did not know who killed DeLegal;

    c.    An activity sheet documenting that Burton had been seen fleeing the scene of the crime with the missing murder weapon;

d.   An audio recording of the police-recorded phone call between Burton and Holden in which Holden clarified that the "Bruce" who was involved with the shooting had been shot in the arm and evidencing Burton's role as an informant;

e.   The affidavit of probable cause to search Holden's house, also demonstrating that police relied on the false information that "Bruce" had been shot in the arm in forming their case against Murray; and

f.   An activity sheet documenting Strickland's cancelled identification lineup.

154.   This previously undisclosed evidence provided the basis for an amended motion to reopen Murray's federal habeas petition. In response to that amended motion, the Philadelphia District Attorney's Office conceded that, in light of the previously suppressed evidence, Haughton and Wesson's recantations were credible and that Murray was likely innocent.

155.   On June 3, 2023, Judge Brody vacated Murray's conviction and sentence and on October 11, 2023, the Honorable Judge Lillian H. Ransom of the Philadelphia Court of Common Pleas granted the prosecution's motion to nolle pros all charges.

156.   Murray was released from the Department of Corrections after more than 41 years of imprisonment.

157.   In response to a parallel presentation of previously withheld evidence, Judge Brody vacated Holden's conviction and sentence on January 25, 2024. He is awaiting a dismissal of all charges in the Philadelphia Court of Common Pleas.

I. **The defendant detectives' conduct is caused by the PPD Homicide Division's established history of unconstitutional practices and the City's deliberate indifference to those practices.**

158.    The unconstitutional conduct of the defendant detectives described above was directly and proximately caused by a long-established history of practices in the PPD in general and specifically in the PPD Homicide Division.

159.    For many years, dating back at least to the 1970s, and continuing well beyond the time of the investigation of Eric DeLegal's murder, the City of Philadelphia had, in force and effect, a policy, practice or custom of unconstitutional misconduct in homicide investigations, and in particular, using coercive techniques in interviews and interrogations to obtain statements, fabricating inculpatory evidence, withholding exculpatory evidence, failing to investigate known exculpatory evidence, and otherwise failing to conduct constitutionally adequate investigations.

160.    These practices were well known to the City of Philadelphia and its policymakers as a result of newspaper investigations including Pulitzer Prize winning reporting in the *Philadelphia Inquirer* in 1977, governmental investigations, complaints from lawyers and civilians, and internal police investigations.

161.    Various cases demonstrate that this misconduct was pervasive within the PPD around the time of the DeLegal murder investigation, Murray's trial in 1983, and thereafter, including the following:

> a.  **Matthew Connor**: In 1980, Connor was convicted of the 1978 rape and murder of an 11-year-old girl whose body was found in the stairwell of an apartment building in Philadelphia. The medical examiner determined that the victim's wounds resulted from an ice pick. In 1989, while Connor was serving a life sentence, a non-profit organization persuaded the Philadelphia District

Attorney's Office to revisit the case. The prosecution then discovered that police failed to turn over exculpatory evidence, including a recording of a call with a prosecution witness that contradicted her trial testimony, and evidence that police considered the victim's half-brother, who had a history of assaulting young girls and was observed carrying an ice pick around the apartment complex, as an alternative suspect. In February 1990, Connor was granted a new trial, and the next month the charges were dismissed.

b. **Gerald Howell:** In late 1982 into the early months of 1983, Philadelphia Police Detectives coerced witnesses into inculpating Howell in a murder that was committed by Kenneth Parnell. PPD Detectives told Arlene Williams, a teenager at the time, that they would arrest Parnell, the father of her child, for the murder if she did not sign a statement inculpating Howell. PPD Detectives also threatened two other teenage witnesses with arrest if they did not come to court to testify against Howell, even though the police had reason to believe that Parnell was the real shooter. Additionally, PPD Detectives suppressed information given to them by the brother of the decedent that Parnell was the shooter. Years later, Parnell confessed to the murder for which Howell had been convicted. In 2022, the DAO conceded that the PPD had suppressed exculpatory evidence. In 2023, a federal judge granted Howell's habeas corpus petition and vacated his conviction. Howell was released in 2023 after being imprisoned for four decades for a crime he did not commit.

c. **Alen Lee**. In September 1983, Alen Lee was arrested in connection with the murder of 25-year-old restaurant manager Jade Wong. The murder was

committed by three Asian men who announced that they were gang members from New York City and who tried to extort Wong for money. Philadelphia detectives, including defendants Lubiejewski and Shelton, secured a conviction of Lee by fabricating an informant statement to implicate Lee, despite having credible information pointing to alternative suspects. Ultimately, Lee's conviction was vacated in April 2004 after Lee presented evidence that at the time of his trial, Philadelphia police failed to disclose evidence of the true perpetrators.

d. **Willie Stokes:** In 1984, PPD detectives arrested a man named Franklin Lee on rape and related charges. After his arrest, homicide detectives interviewed him about a 1980 murder and falsely told him that another witness had identified Willie Stokes as the person who committed that murder. Detectives insisted that Lee knew that Stokes was the murderer and that he needed to cooperate with their investigation, or otherwise they would "hang" him. Lee succumbed to the pressure and agreed to sign a false statement implicating Stokes in the murder. For years, Lee continued to have contact with the investigating detectives, including defendants Gerrard and Gilbert, who, in order to maintain control over their informant, arranged for him to have access to drugs and sexual encounters while incarcerated. Stokes remained wrongfully imprisoned for 39 years until December 2021 when a federal district court vacated his conviction based on the investigating detectives' pervasive misconduct.

e. **Curtis Crosland:** In 1987, PPD officers interviewed an informant with a long

history of violent crimes who was seeking assistance from law enforcement to reduce his sentence for a parole violation. The informant told officers that Curtis Crosland had at some undetermined time in 1986, confessed that he committed a 1984 robbery and murder at a neighborhood grocery store in South Philadelphia. Investigating detectives, including defendant McNesby, knew that the informant's statement was false; the informant had provided inconsistent information to police, had failed a polygraph, and had told other family members that another person—that is, not Curtis Crosland—had admitted to the crime. Despite this knowledge, detectives persisted in bringing charges against Crosland and then suppressed all information in their possession showing the falsity of the informant's testimony. Further, detectives suppressed and concealed information pointing to an alternative suspect—information that was highly credible as the suspect matched the size and description of the perpetrator given by eyewitnesses to the shooting. Finally, as Crosland's 1989 trial approached, detectives pressured and coerced a vulnerable witness who suffered from mental health disorders and had attempted suicide to provide testimony asserting that Crosland had expressed fear about the fact that an award offered to the community for information about the shooting would lead to an arrest. Crosland was convicted as a result of these unlawful police tactics and remained incarcerated for 34 years until an investigation by the CIU found exculpatory information in police files. In 2021, a federal district court accepted the CIU's concession that Crosland was entitled to relief and was likely innocent, and vacated the conviction.

f. **Andrew Swainson:** PPD Homicide Division detectives based their 1988 arrest of Swainson on the testimony of a single witness who had been taken into custody while running from the scene of the murder in blood-soaked clothes. The witness provided a facially unbelievable narrative of the shooting after PPD detectives coerced him into identifying Swainson as the perpetrator. After this witness recanted his statements several times, PPD detectives pressured a different vulnerable young witness to support his false claims at trial. Based on this misconduct and the suppression of exculpatory evidence, in June 2020, Swainson's conviction was vacated and all charges were dismissed.

g. **Pedro Alicea**: In 1989, after failing for four years to resolve a 1985 double homicide of brothers Hector and Luis Camacho, PPD detectives fabricated a case against Pedro Alicea out of whole cloth. To build a false case against Alicea, detectives disregarded significant evidence demonstrating that two local drug dealers were responsible, and leaned on vulnerable individuals to obtain false identifications of Alicea as the shooter. The officers pressured Angel Fuentes, a longtime informant who had a close personal relationship with the lead detective, and who was facing significant prison time on a number of open charges, to endorse a fabricated statement identifying Alicea as the shooter. They then coerced Ray Velez, who had himself been implicated in the murders, to likewise falsely identify Alicea as the shooter, by detaining him and threatening to charge him with the murders if he did not submit. Detectives suppressed substantial exculpatory evidence, including a

reliable eyewitness statement, pointing to the true perpetrators. Alicea was convicted as a result of the detectives' misconduct and wrongfully imprisoned for more than 31 years before the exonerating evidence was discovered by the CIU, resulting in the vacatur of his conviction and release in 2020.

h. **Jackie Combs Jr**.: PPD Homicide Division detectives coerced four young witnesses into falsely claiming that Combs committed a murder in 1990. Each witness later provided consistent accounts of the manner in which their false statements were secured: through the detectives' use of overwhelming physical and verbal abuse.

i. **Donald Ray Adams:** PPD Homicide Division detectives coerced a witness to implicate Adams in a 1990 murder by threatening the witness and also offering to provide her financial support for her testimony. In securing the statement, detectives ignored the fact that Adams's physical description was vastly different from the description provided by witnesses at the scene. Adams's conviction was later vacated, and he was acquitted at a retrial. His subsequent civil suit resulted in a financial settlement.

j. **Carlos Hernandez and Ed Williams**: PPD Homicide Division detectives coerced a false statement from a witness to a robbery and murder by detaining the witness without food or water for days and by beating the witness. That statement led to the 1991 arrests of Hernandez and Williams, but it was later proven that Williams had been in a secured-treatment facility at the time of the crime, thus undermining all of the evidence produced by the detectives as to both defendants.

k. **James Dennis**: PPD Homicide Division detectives investigating a murder in 1991 coerced witnesses to identify Dennis while at the same time they intentionally concealed information which provided Dennis with an incontrovertible alibi. The detectives' conduct led to the Third Circuit's issuance of an *en banc* decision concluding that the concealment of evidence violated Dennis's due process rights. *See Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 307 (3d Cir. 2016).

l. **Anthony Wright**: Wright was convicted of the 1991 rape and murder of an elderly woman based on Homicide Division detectives' fabrication of a confession and planting of evidence. DNA testing later confirmed Wright's innocence, and he was acquitted at a retrial. His subsequent civil rights action litigated in this Court resulted in a settlement of nearly $10 million.

m. **Troy Coulston:** In 1991, Coulston was convicted of a 1989 murder based on PPD Homicide Division detectives knowingly presenting fabricated trial testimony, coercing false witness statements from a particularly vulnerable, teenage witness, and suppressing exculpatory evidence undermining the credibility of a key witness, the actual perpetrator of the murder. Mr. Coulston's conviction was vacated in 2021 based on the discovery of previously suppressed exculpatory evidence.

n. **Walter Ogrod:** In 1992, PPD detectives coerced and fabricated a false confession from Ogrod, a trucker with a low-average IQ, to the 1988 murder of a four-year-old girl. Ogrod had driven all night and had not been to bed in 36 hours when the lead detective interrogated him. Detectives interrogated

Ogrod for hours, then wrote out a fabricated statement in Q-and-A form they falsely claimed was a verbatim record of a voluntary statement from Ogrod, and coerced Ogrod into signing it. At his first trial, 11 of 12 jurors voted to acquit before a mistrial was declared. At a retrial three years later, with the aid of a notorious jailhouse snitch, the state convicted Ogrod of capital murder. Ogrod has since been exonerated and he was released from prison after serving more than 25 years for a crime he did not commit.

o. **Willie Veasy:** Veasy was convicted of a murder based on a 1992 confession secured by PPD Homicide Division Detectives' use of physical force. The confession was plainly untrue in light of a fully corroborated alibi that Veasy was working in a popular and busy restaurant at the time of the murder. Veasy's conviction was vacated in 2019 upon the motion of the Philadelphia District Attorney's Office, and his subsequent civil rights suit resulted in a multi-million-dollar settlement.

p. **Percy St. George:** A PPD Homicide detective coerced two people in 1993 to give false statements implicating St. George in a murder. When the detective was asked to testify about the allegations of coercion and fabrication, he asserted his Fifth Amendment privilege against self-incrimination and declined to answer questions. Despite that assertion, the detective was permitted to remain active in PPD Homicide Division investigations for several years.

q. **Shaurn Thomas**: PPD Homicide Division detectives arrested Thomas in 1993 on charges that he was involved in a 1990 murder. Thomas had a

documented alibi that he was present in juvenile court at the time the murder occurred, but based on testimony from another man who was involved in the murder, Thomas was convicted. In May 2019, the Philadelphia District Attorney's Office agreed to dismiss the charges after discovering, among other things, previously undisclosed information in police files showing that officers had questioned a suspect just following the crime who provided police non-public facts about the murder and failed a polygraph test. Thomas's civil rights suit resulted in a settlement for more than $4 million.

r. **Steven Lazar:** Lazar was convicted of a 2007 murder as a result of PPD Homicide Division Detectives fabricating witness statements and securing a false confession by knowingly subjecting Lazar to more than 30 hours of interrogation while he was undergoing severe opioid withdrawal. Lazar's conviction was vacated in March 2023 based on the discovery of suppressed evidence after he had spent approximately 16 years in prison.

162.     As evidenced by the pervasive nature of the conduct in these cases, detectives in the PPD Homicide Division had free reign to engage in unconstitutional actions with the knowledge and acquiescence of City policymakers and PPD Homicide Division supervisors and command staff, all of whom were deliberately indifferent to this misconduct.

163.     In particular, the defendant detectives responsible for Murray's wrongful conviction have well-documented histories of serious, similar misconduct including, but not limited to, the following examples:

a. Defendants Gerrard and Gilbert have become notorious for their involvement in the infamous "Sex for Lies" scandal, in which they allowed incarcerated

men to visit the Homicide Division headquarters and have sexual encounters with women in interview rooms in exchange for their testimony.[1] This practice resulted in fabricated statements and multiple wrongful convictions, including the conviction of Willie Stokes. *See supra* ¶ 161(d).

b.  One such case includes claims of misconduct against many of the same detectives who caused Murray's wrongful conviction: defendants Gilbert, Gerrard, Lubiejewski, Shelton, and McNesby.[2] William Franklin and Major Tillery allege that as a result of these defendants' concerted efforts to fabricate evidence, they were convicted and sentenced to life for a murder they did not commit. On February 28, 2024, Philadelphia Court of Common Pleas Judge Tracy Brandeis-Roman overturned Franklin's conviction, releasing him after 44 years in prison, based on evidence that the defendant detectives coerced a witness, who later recanted, to falsely inculpate him.

c.  Defendants Lubiejewski and Lieutenant Shelton caused the wrongful conviction of Alen Lee in 1988, who was exonerated after 16 years of incarceration for a murder he did not commit when a post-conviction investigation revealed that they had suppressed exculpatory evidence, fabricated evidence and testified falsely.[3] *See supra* ¶161(c).

d.  Defendant McNesby contributed to the wrongful conviction of Curtis

---

[1] Samantha Melamed, *The Homicide Files, Part 3: 'Sex for Lies'*, PHILA. INQUIRER (July 20, 2021).
[2] Samantha Melamed, *A man who served 37 years may be freed after informant said cops provided sex for false testimony*, PHILA. INQUIRER (Jan. 3, 2022).
[3] Samantha Melamed, *The Homicide File Databases*, PHILA. INQUIRER (last updated Dec. 26, 2021), searchable by officer name.

Crosland by coercing a hospitalized, vulnerable women into fabricating an inculpatory statement against Mr. Crosland.[4] *See supra* ¶ 161(e).

e.  In 1974, defendant Detective Grace was found to have conducted several illegal interrogations of a suspect, denying her access to her counsel and continuing to question her after both she and her counsel had invoked her right to remain silent.[5]

f.  In 1975, defendant Rosentstein was reported to be present for an interrogation during which a 23-year-old suspect was "stabbed in the groin with a sword-like instrument" and beaten so thoroughly with a baton that he was carried out of police headquarters on a stretcher.[6]

164.    At the time of the investigation of the DeLegal murder and prosecution of Murray between 1980 and 1983, the PPD had a policy, practice, or custom of concealing and withholding exculpatory evidence, creating fabricated evidence, and initiating prosecutions without probable cause.

165.    In particular, in the 1980s, PPD initiated the use of "activity sheets" for the purpose of allowing detectives in the Homicide Division to make records regarding their work on an investigation. Soon after the introduction of activity sheets as a form of recordkeeping for PPD investigations, detectives began using activity sheets to record information exculpatory to the person or persons detectives targeted as suspects.

166.    No one outside PPD was aware of PPD's use of activity sheets, let alone the use

---

[4] *Id.*

[5] Johnathan Neumann & William K. Marimow, *The Homicide Files: How Phila. Detectives Compel Murder 'Confessions,'* PHILA. INQUIRER (Apr. 23, 1977).

[6] *Id.*

of activity sheets for the recording of exculpatory information.  Instead, activity sheets were used exclusively within the PPD, and the information recorded in those sheets was never shared with either the Philadelphia District Attorney's Office or members of the defense bar.

167.    Policymakers within the PPD were aware of these practices and, with deliberate indifference to the risk of constitutional violations, tolerated and ratified the practice.  As a result of these practices, defendants in homicide cases were routinely deprived of exculpatory information.

168.    These practices, as exemplified by the investigations in Murray's case and in those detailed above, continued for years due to the deliberate indifference of the City of Philadelphia.

169.    Additionally, in the 1980s, concurrent with the time of the investigation of this case by the PPD, there was a pattern, practice, and custom within the Department of violating the constitutional rights of criminal suspects and others, including systemic violations of the Fourth and Fourteenth Amendments.

170.    On three separate occasions in the 1980s, courts in the Eastern District of Pennsylvania issued orders enjoining the PPD from engaging in such practices.  *See Cliett v. City of Philadelphia,* No. 85-cv-1846 (E.D. Pa. 1985) (consent decree arising out of "Operation Cold Turkey," which resulted in the unlawful arrest and detention of 1,500 individuals through drug enforcement practices); *Spring Garden Neighbors v. City of Philadelphia,* 614 F. Supp. 1350 (E.D. Pa. 1985) (enjoining police sweeps of Latinos in the Spring Garden area in a homicide investigation); *Arrington v. City of Philadelphia,* No. 88-cv-2264 (E.D. Pa. 1988) (enjoining stops, detentions, and searches of African-American men during investigation of the "Center City Stalker").

171.    Thereafter, in the late 1980s and early 1990s, a narcotics squad operating out of the 39th Police District engaged in widespread unconstitutional practices, including fabrication of evidence, unlawful search and arrest warrants, concealment of evidence, false allegations of criminality, fabricating and planting evidence, coercive and physically abusive interrogations, and theft. This squad engaged in these practices for years and violated the rights of thousands of persons, due to the deliberate indifference of the City of Philadelphia, including the disregard of credible complaints to the PPD Internal Affairs Division and the District Attorney, biased internal investigations, and a practice and custom of exonerating officers regardless of evidence of misconduct.

172.    These systemic and unconstitutional practices and customs were addressed only upon investigation by the FBI and prosecution of the officers by the United States Attorney's Office.

173.    As a result of this pattern of police misconduct that was in effect at the time of the investigation of the homicide for which Murray was charged, and in light of evidence showing substantial racial bias in PPD practices, the City of Philadelphia entered into a settlement agreement requiring wide ranging reforms in the PPD, and in particular providing for specific limitations on PPD investigative practices and policies. *See NAACP v. City of Philadelphia,* No. 96-cv-6045.

174.    In summary, at the time of the investigation and prosecution of Murray, the City of Philadelphia and its policymakers were deliberately indifferent to PPD's policy, practice, and custom of:

a.    Concealing and/or failing to disclose exculpatory evidence, engaging in unlawful interrogation of suspects, using coercion and threats during

interrogations, unlawful witness detentions and interrogations, fabricating and planting evidence, fabricating witness and suspect statements, and using improper identification procedures;

b. Using these practices to target people of color for unlawful treatment;

c. Failing to take appropriate disciplinary or other corrective actions with respect to police officers who engaged in illegal or unconstitutional conduct and/or violated generally accepted police practices;

d. Failing to properly train and supervise officers with respect to the constitutional limitations on their investigative, detention, search, and arrest powers;

e. Ignoring, with deliberate indifference, systemic patterns of police misconduct and abuse of civilians' rights in the course of police investigations and prosecutions of criminal suspects and defendants, including unlawful police interrogations, searches, and arrests, coercion of witnesses, improper identification procedures, falsifying and fabricating evidence, and suppressing exculpatory evidence; and

f. Failing to properly sanction or discipline PPD officers who were aware of and concealed and/or aided and abetted violations of constitutional rights of individuals by other PPD officers, thereby causing and encouraging Philadelphia police, including the defendant officers in this case, to violate the rights of citizens such as Murray.

175.    At the time of the investigation of the DeLegal murder and the prosecution of Murray, and for many years before and thereafter, the City of Philadelphia was deliberately

indifferent to the need to train, supervise, and discipline police officers. Specifically, the Internal Affairs Division (IAD) of the PPD failed to provide an internal disciplinary mechanism that imposed meaningful disciplinary and remedial actions in the following respects:

    a.   Excessive and chronic delays in resolving disciplinary complaints;

    b.   A lack of consistent, rational, and meaningful disciplinary and remedial actions;

    c.   A failure to effectively discipline substantial numbers of officers who were found to have engaged in misconduct;

    d.   A failure to establish an internal investigatory process that was not arbitrary and inconsistent;

    e.   Imposing incident-based, rather than progressive discipline, resulting in the failure to penalize repeat violators;

    f.   Failure to institute necessary training and supervision for IAD investigators in order to ensure proper investigations;

    g.   Institution of investigative procedures which adopted a default position that officers had not violated any rules;

    h.   Failing to institute any quality control measures to ensure valid IAD findings and conclusions;

    i.   Failing to adopt an effective early warning system to identify, track, and monitor officers with significant disciplinary histories;

    j.   Failing to interview available eyewitnesses to incidents involving citizen complaints of misconduct; and

    k.   Failing to acknowledge the disproportionate and extreme use of violence and

other improper conduct used by police officers.

176.    Given all of the above, the City of Philadelphia, through its deliberate indifference, was a moving force in the violation of Murray's constitutional rights.

**J.  The violations of Mr. Murray's constitutional rights and his harms and losses.**

177.    Murray's unlawful arrest, prosecution, conviction, and incarceration was caused by the unconstitutional conduct of the defendants who knowing, intentionally, and recklessly fabricated evidence, concealed and suppressed exculpatory information, and maliciously prosecuted him.

178.    The conduct of the individual defendants was proximately caused by the actions of the City of Philadelphia who, with deliberate indifference, adopted policies, practices, and customs and/or failed to train, supervise, and discipline in such a way as to allow the defendants to engage in pervasive unconstitutional conduct.

179.    The unlawful conduct outlined above caused Murray to be improperly arrested, prosecuted, and imprisoned for more than forty years for a crime he did not commit.

180.    As a direct and proximate result of defendants' actions and omissions, Murray sustained injuries and damages, including loss of his freedom; loss of the most productive years of his adult life; pain and suffering; mental anguish; emotional distress; indignities; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

181.    As a direct and proximate result of defendants' actions and omissions, Murray was deprived of his familial relationships, including time with his family, specifically his infant child, and other loved ones.

182.    As a direct and proximate result of defendants' actions and omissions, Murray sustained economic injuries and damages, including loss of income and loss of career opportunities, as he was incarcerated during the most productive years of his adult life.

183.    As a direct and proximate result of defendants' actions and omissions, Murray sustained and continues to suffer physical injuries and damages, including physical pain and suffering, personal injuries, physical illness, and inadequate medical care.

184.    In particular, while incarcerated, Murray was diagnosed with advanced colon cancer, a diagnosis that he could have avoided entirely or discovered earlier and treated more effectively had he not been incarcerated.

185.    As a direct and proximate result of defendants' actions and omissions, Murray sustained mental health injuries and damages, including adverse psychological symptoms, mental anguish, and emotional distress, which he continues to experience to this day and which will continue into the future.

## V.    Causes of Action

186.    Plaintiff Bruce Murray brings the below causes of actions against the City of Philadelphia and the following who are collectively identified as "individual defendants": Leon Lubiejewski; James McNesby; Douglas Culbreth; Detective Curcio; Detective Diegel; Lynn Sturkey; James Potocnak; Daniel Rosenstein; Nicole Brongo Kiwa Ford as the Executrix of the Estate of Ernest Gilbert; and John Does 1-5, the Personal Representatives of the Estates of Lawrence Gerrard, Albert Lory, Jr., Lawrence Grace, William Shelton, and Douglas Culbreth.

**Count 1**
**Plaintiff v. Individual Defendants**
**Fabrication of Evidence**

187.    The individual defendants fabricated evidence in support of a prosecution against Mr. Murray and/or aided and abetted the creation of fabricated evidence.  The fabrication of this evidence caused Mr. Murray's wrongful conviction and, therefore, violated his right to a fair trial and due process of law under the Fourteenth Amendment to the U.S. Constitution.

**Count 2**
**Plaintiff v. Individual Defendants**
**Malicious Prosecution**

188.    The individual defendants caused the initiation of a prosecution against Mr. Murray without probable cause and with malice. The criminal charges they caused to issue against Mr. Murray were terminated favorably to Mr. Murray. These defendants, therefore, subjected Mr. Murray to a malicious prosecution in violation of the Fourth and/or Fourteenth Amendments to the U.S. Constitution.

**Count 3**
**Plaintiff v. Individual Defendants**
**Deliberate Suppression of Exculpatory Evidence**

189.    By intentionally concealing and deliberately suppressing exculpatory evidence, the individual defendants violated Mr. Murray's right to due process of law under the Fourteenth Amendment to the U.S. Constitution.

**Count 4**
**Plaintiff v. Defendant City of Philadelphia**
**Municipal Liability**

190.    Defendant City of Philadelphia, with deliberate indifference, adopted and/or acquiesced in policies, practices, and customs which were a moving force in the violation of Mr. Murray's constitutional rights, and, further, defendant City of Philadelphia, with deliberate

indifference, failed to properly train, supervise, and/or discipline officers and, as such, was a moving force in the violations of Mr. Murray's constitutional rights.

**Count 5**
**Plaintiff v. Individual Defendants**
**Supplemental Claim – Malicious Prosecution**

191.    The individual defendants, as described above, caused the malicious prosecution of Mr. Murray, and, as such, committed the tort of malicious prosecution under the laws of the Commonwealth of Pennsylvania.

**WHEREFORE**, plaintiff Bruce Murray respectfully requests:

A.      Compensatory damages as to all defendants;

B.      Punitive damages as to the individual defendants;

C.      Reasonable attorneys' fees and costs;

D.      Such other and further relief as may appear just and appropriate.

Plaintiff hereby demands a jury trial.


_/s/ Grace Harris_            
Grace Harris
PA ID No. 328968
Jonathan H. Feinberg
PA ID No. 88227
KAIRYS, RUDOVSKY, MESSING,
  FEINBERG & LIN LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA  19106
215-925-4400

Amelia Green*
Owanaemi Briggs*
NEUFELD  SCHECK BRUSTIN
  HOFFMANN & FREUDENBERGER LLP
99 Hudson Street, 8th Floor
New York, NY 10013
212-965-9081

_Counsel for Plaintiff_

* Motion for _pro hac vice_ admission forthcoming